## WIUNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| MOBILE NETWORKING SOLUTIONS, LLC, | |
| Plaintiff, | |
| vs. | **CIVIL ACTION NO.** |
| | **JURY TRIAL DEMANDED** |
| SLING MEDIA LLC, | |
| Defendant. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Mobile Networking Solutions, LLC ("MNS") files this Complaint for Patent Infringement against Sling Media L.L.C. for infringement of U.S. Patents Nos. 7,543,177 and 7,958,388 relating to large-scale data storage, processing, and management.

### PARTIES

1.    MNS is a limited liability company organized and existing under the laws of the State of Texas with its principal place of business at 1400 Preston Road, Suite 483, Plano, Texas 75093.

2.    Sling Media LLC is Delaware limited liability company headquartered in Foster City, California.

3.    Sling Media LLC formerly was named Sling Media Inc.

4.    Sling Media may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 (phone: 302-636-5401).

5.    Sling Media provides multi-screen smart TV solutions and operates the SlingCloud Platform comprising 16 data platforms serving millions of U.S.

customers with streaming content on smart TVs, tablets, game consoles, smartphones, and streaming devices.

6.     To provide reliable and scalable streaming and cloud data services to customers,   Sling Media operates a cloud-based data analytics platform that analyzes user behavior, input data, and social activity to provide a highly resilient and highly available service personalized to each user that scales on demand to keep up with Sling's expanding customer base and changes on the internet including centralized business logic across 16 data delivery platforms delivering common experiences to customers.

7.     Sling maintains datacenters with Hadoop clusters running RedHat OS. Sling uses Hadoop as its infrastructure to run MapReduce algorithms on raw data ingested hourly from hardware and software systems in the field.

## JURISDICTION AND VENUE

8.     This is an action under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*. and namely §§ 271, 281, and 284-285, for infringement by Sling of U.S. Patent Nos. 7,543,177 (the "'177 Patent") and 7,958,388 (the "'388 Patent") (collectively, the "Patents-in-Suit").

9.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

10.     Sling Media is subject to general and specific personal jurisdiction of this Court based upon its regularly conducted business in Delaware giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Sling Media would not offend traditional notions of fair play and substantial justice.

11.     Sling Media, directly and through subsidiary business units, has committed and continue to commit acts of infringement in this district pursuant to 35 U.S.C. § 271(a) by making, using, selling, offering to sell, testing, deploying,

and exercising control and obtaining beneficial use in this district of products and services that infringe the asserted MNS patents.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(b) and 28 U.S.C. § 1391.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1400(b) as Sling Media is incorporated in and thus resides in Delaware.

## THE MNS PATENTS

14.     MNS is the owner by assignment of all right, title, and interest in and to U.S. Patent Nos. 7,543,177 and 7,958,388 (the "Asserted Patents"), both titled, "Methods and Systems for a Storage System."

15.     A true and correct copy of the '177 patent is attached as Exhibit A.

16.     A true and correct copy of the '388 Patent is attached as Exhibit B.

17.     MNS possesses all rights of recovery under the Asserted Patents.

18.     The Asserted Patents issued from continuations of Application No. 10/284,199 filed on October 31, 2002.

19.     The U.S. Patent Office issued the '177 Patent on June 2, 2009, after a full examination based upon an application filed by inventors Melvin James Bullen, Steven Louis Dodd, William Thomas Lynch, and David James Herbison.

20.     The Examiner stated the following reasons for allowing the claimed subject matter of the '177 Patent:

> Regarding claim 1, the prior art does not disclose or reasonably suggest, in combination with the remaining limitations, a switch controller that executes software, including a routing algorithm and a management system capable of receiving fault messages from the memory section controllers and inactivating the memory section corresponding to the fault message received by changing the routing algorithm.
>
> Regarding claim 26, the prior art does not disclose or reasonably

suggest, in combination with the remaining limitations, a management system determining a routing algorithm for use by a switch controller that executes software, including the routing algorithm, to configure a selectively configurable switch in connecting the memory section and an interface and the management system removing from service the memory section from which the fault message was received by changing the routing algorithm.

Regarding claim 40, the prior art does not disclose or reasonably suggest, in combination with the remaining limitations, programmable means for switching data being transmitted between the means for storing and one or more interfaces based on a routing algorithm and means for receiving the fault message, removing from service the means for storing from which the fault message was received by changing the routing algorithm.

21.     The U.S. Patent Office issued the '388 Patent on June 7, 2011, after a full examination based upon an application filed by the same inventors.

22.     The Examiner stated the following reasons for allowing the claimed subject matter of the '388 Patent: "the prior art does not teach or reasonably suggest providing, by the management system, the routing algorithm to the switch controller and determining, by the management system in response to the detecting, a new routing algorithm that redirects data for the memory device to a replacement memory device; and providing the new routing algorithm to the switch controller."

23.     The Abstract of the Asserted Patents describes the claimed subject matter as being directed to "[a] storage system that may include one or more memory sections, one or more switches, and a management system . . . [t]he memory sections include memory devices and a section controller capable of detecting faults with the memory section and transmitting messages to the management system regarding detected faults. The storage system may include a management system capable of receiving fault messages from the section

controllers and removing from service the faulty memory sections . . . [a]dditionally, the management system may determine routing algorithms for the one or more switches."

24.    Figure 6 in the specification of the Asserted Patents is a functional diagram exemplifying the claimed subject matter:



25.    The inventors recognized and noted in the specification that large-scale storage systems suffered from problems in throughput for high-volume, real-time applications.

26.    In operation, the switches, memory sections, and management system of the Asserted Patents receive fault messages from the memory section controllers and remove from service the memory section from which the fault message was received, and the management system may further determine an algorithm for use by a switch fabric in interconnecting the memory sections and external device

interfaces and instruct the switch to executed the determined algorithm. '177 Patent at 2:21-34.

27.    Those of skill in the art at the time of the inventions claimed in the Asserted Patent would recognize that the claimed subject matter addresses performance limitations inherent in disk storage technologies such as input/output bottlenecks and improves network operations in the event of signal and/or equipment failure.

28.    The claimed subject matter of the Asserted Patents is particularly applicable to improve the operation of parallel processing technologies in big-data distributed storage systems such as the Hadoop Distributed File System (HDFS).

**Hadoop Distributed File System**

29.    The Hadoop Distributed File System (HDFS) is used for storage and processing of large data files across a cluster of storage hardware.

30.    HDFS is a distributed, reliable, scalable and highly fault-tolerant file system for data storage, and Sling uses HDFS for long-term storage of user and content data that Sling analyzes to gain knowledge of user preferences and behavior.

31.    An HDFS instance may consist of hundreds or even thousands of servers (DataNodes) that each store part of a large data file.

32.    HDFS features high fault tolerance and automatic fault recovery making it suitable for deployment on commodity hardware and particularly valuable to Sling for reliable access to data.

33.    Operational advantages of HDFS include efficient processing by executing application instructions near the subject data.  HDFS's cluster design and input/output pathing minimizes network congestion and increases throughput.

34.    HDFS handles big data, typically 10-100GB or more with diverse data types including structured and unstructured data, economically distributing the

computational load across multiple DataNodes.

35. HDFS DataNodes are a cluster of computers capable of executing the workload components such as storing HDFS data blocks and performing block replication.

36. Distributing the computing load across DataNodes requires multiple servers having access to the data, and HDFS meets this need by ensuring that the entire calculation process does not terminate when an error occurs within a HDFS cluster.

37. The NameNode is responsible for keeping track of file system metadata including a list of blocks in an HDFS file and a list of DataNodes.

38. MapReduce decomposes the processing task of a large data set query for processing on multiple running nodes. As a result, Sling is able to analyze massive datastores. For example, Sling is able to query terabytes of user data for specific user actions such as system resets.

39. Sling's Hadoop/HDFS deployment ensures data availability because it is self-healing and fault tolerant.

40. In the event of a fault (i.e., a lost DataNode), the NameNode consults metadata, finds affected data, consults a Rack Awareness script, and instructs the DataNode to replicate. This HDFS process is described pictorially below:



41.     In Sling's implementation of HDFS, the NameNode manages the file system namespace and regulates access to files by clients and DataNodes manage storage attached to the nodes they run on.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 7,543,177

42.     MNS re-alleges and incorporates by reference the preceding paragraphs as if stated here.

43.     Sling Media has and continues to infringe at least claims 1 and 13 of the '177 Patent.

44.     Sling Media makes, uses, sells, offers for sale, and/or imports the Sling Data Platform using HDFS (the "Accused Instrumentalities").

45.     The Accused Instrumentalities embody and practice the subject matter claimed in the asserted claims of the '177 Patent.

46.     Asserted claim 1 of the '177 Patent recites a storage system, comprising: one or more memory sections, including: one or more memory devices having storage locations for storing data, and a memory section controller capable of detecting faults in the memory section and transmitting a fault message in response to the detected faults; one or more switches, including: one or more interfaces for connecting to one or more external devices; a switch controller that executes software, including a routing algorithm; and a selectively configurable switch fabric connected to one or more memory sections and the one or more interfaces and interconnecting the memory sections and the one or more interfaces based on the routing algorithm stored in the switch controller; and a management system capable of receiving fault messages from the memory section controllers and inactivating the memory section corresponding to the fault message received by changing the routing algorithm, and wherein the management system is further capable of determining and changing the routing algorithm for use by the

selectively configurable switch fabric in interconnecting the memory sections and the one or more interfaces, providing the determined routing algorithm to the switch controller, and instructing the switch controller to execute the determined routing algorithm.

47.    Asserted claim 13 of the '177 Patent recites a method for use in a storage system, comprising: storing data in a storage locations in a memory device, the memory device included in a memory section; a management system determining a routing algorithm for use by a switch controller that executes software, including the routing algorithm, to configure a selectively configurable switch in connecting the memory section and an interface; the management system providing the determined routing algorithm to the switch controller and instructing the switch controller to execute the determined routing algorithm; the selectively configurable switch connecting the memory section to the interface based on the routing algorithm; detecting by a memory section controller a fault in regard to the data stored in the memory device and transmitting a fault message in response to the detected fault to the management system; receiving the fault message at the management system; and the management system removing from service the memory section from which the fault message was received by changing the routing algorithm.

48.    The Accused Instrumentalities, and HDFS implementations on SlingCloud, are storage systems.

49.    A typical architecture of a Hadoop cluster features Slave nodes for storage and the NameNode that oversees and coordinates the data storage function.

50.    In normal operation, the Accused Instrumentalities implementing HDFS store data blocks in a DataNode's (memory section) local file system that uses storage including memory devices (e.g., HDD, SSD). The memory devices store data in physical storage locations (e.g., HDD sectors, SSD blocks).

51.    The Accused Instrumentalities include a management system that determines a routing algorithm for use by a switch controller that executes software, including the routing algorithm, to configure a selectively configurable switch in connecting the memory section and an interface.

52.    In normal operation, the Accused Instrumentalities implementing HDFS manage the HDFS NameSpace (e.g., by operation of the HDFS NameNode daemon) and map data file names to sets of data blocks, map data blocks to specific DataNodes, and map DataNodes to specific racks in the HDFS cluster.

53.    In the Accused Instrumentalities, NameNode NameSpace tables and resultant NameNode instructions based on them (i.e. the I/O path a HDFS client uses to read/write a specific data block) are routing algorithms used by the HDFS NameNode (switch controller) that controls how specific HDFS I/O requests traverse the HDFS cluster.

54.    Consistent with the asserted claims, the Accused Instrumentalities implementing HDFS achieve high fault tolerance by ensuring persistence of file system metadata.

55.    In the accused HDFS instances, the HDFS namespace is stored by the NameNode, which uses a transaction log called the EditLog to persistently record every change that occurs to file system metadata.

56.    For example, creating a new HDFS file in the Accused Instrumentalities causes the NameNode to insert a record into the EditLog. Changing the replication factor of a file also causes a new record to be inserted into



the EditLog.   The NameNode stores the EditLog, and the entire file system NameSpace, including the mappings and system properties, is stored by the NameNode.

57.    The figure above provides a representative diagram of the switch controller (NameNode), routing algorithm (metadata and file system), memory section (DataNode N), and memory devices (devices labeled A, C).

58.    In the accused HDFS implementations, the NameNode daemon determines the routing algorithm by processing the metadata tables in response to HDFS client Read and Write operations (exemplified in the figures below).



59.    The Accused Instrumentalities include network switches.

60.    In large clusters, the Accused Instrumentalities spread the nodes across multiple racks.  Nodes of a rack share a switch, and these rack switches, which are selectively configurable, are in turn connected by one or more core switches.

61.    In the Accused Instrumentalities, selectively configurable rack switches connect HDFS data nodes (memory sections) to an interface.

62.    In the event of an HDFS I/O request, the rack switch routes the request to the proper HDFS data node in accordance with the HDFS file system NameSpace that includes the mapping of blocks to files.

63.    In normal operation of the Accused Instrumentalities, a memory section controller (e.g., data node daemon) detects a fault in regard to data stored in the memory device and a fault message is transmitted to the management system (e.g., HDFS NameNode) in response to the detected fault.

64.    During normal operation, each DataNode periodically sends a heartbeat message to the NameNode.  If a subset of DataNodes lose connectivity with the NameNode, the NameNode detects the fault by the absence of a heartbeat message and marks the affected DataNodes as dead and ceases forwarding any new I/O requests to them.  The NameNode tracks which blocks need to be replicated due to a fault and initiates replication when necessary.

65.    By default, the heartbeat is transmitted every three seconds, set by dfs.heartbeat.interval.

66.    In addition to detecting a fault by monitoring heartbeats, HDFS DataNodes create threads that run a DataBlockScanner object that scans the data blocks (and replicas) stored in the DataNode to detect faults.

67.    The Name Node daemon receives the fault message in the NameNode (management system) due to either a disruption in heartbeats from a DataNode or

receipt of a DataBlockScanner report indicating a fault.

68.     During normal operation of the Accused Instrumentalities, upon detecting a dead DataNode (e.g., a DataNode with no heartbeat) the NameNode daemon (management system) bypasses the dead DataNode and instead sends I/O requests to the other DataNodes storing replicas of blocks that were stored on the dead DataNode.  If a corrupted block is detected (e.g., via DataBlockScanner) the NameNode daemon (management system) marks the block replica as corrupt and then schedules a copy of the block to be replicated on another DataNode, which results in an updated HDFS NameSpace (a new routing algorithm) so its replication factor is back at the expected level.  Thus, during normal operation, the management system removes from service the memory section from which a fault message was received by changing the routing algorithm.

69.     Sling Media is on notice of the infringing products, services, features, and how Sling operates the Accused Instrumentalities to perform the claimed methods and use the claimed apparatuses.

70.     Sling Media's infringing conduct has damaged MNS.

71.     Sling Media is liable to MNS in an amount that adequately compensates it for Defendants' infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT II
## INFRINGEMENT OF U.S. PATENT NO. 7,958,388

72.     MNS re-alleges and incorporates by reference the preceding paragraphs as if stated here.

73.     Sling Media has infringed and continues to infringe at least claims 1 and 2 of the '388 Patent by making, using, selling, and/or offering to sell the Accused Instrumentalities.

74.    The Accused Instrumentalities embody and practice the asserted claims of the '388 Patent.

75.    Asserted claim 1 of the '388 Patent recites a storage system, comprising: one or more memory sections, including one or more memory devices having storage locations for storing data, and a memory section controller capable of detecting faults in the memory section and transmitting a fault message in response to the detected faults; one or more switches, including one or more interfaces for connecting to one or more external devices; a switch controller that executes software, including a routing algorithm; and a selectively configurable switch fabric connected to one or more memory sections and the one or more interfaces and interconnecting the memory sections and the one or more interfaces based on the routing algorithm; and a management system capable of receiving fault messages from the memory section controllers and inactivating the memory section corresponding to the fault message received by changing the routing algorithm, and wherein the management system is further capable of determining the routing algorithm for use by the selectively configurable switch fabric in interconnecting the memory sections and the one or more interfaces, and providing the routing algorithm to the switch controller.

76.    Asserted claim 2 of the '388 Patent recites a method for use in a storage system, comprising: storing data in storage locations in a memory device, the memory device included in a memory section; determining, by a management system, a routing algorithm for use by a switch controller that executes software, including the routing algorithm; providing, by the management system, the routing algorithm to the switch controller; executing, by the switch controller, the routing algorithm, to configure a configurable switch connecting the memory section to an interface; detecting a fault associated with the data in the storage locations in the memory device; determining, by the management system in response to the

detecting, a new routing algorithm that redirects data for the memory device to a replacement memory device; and providing the new routing algorithm to the switch controller.

77.     In normal operation of the Accused Instrumentalities, the management system determines a new routing algorithm that redirects data for the memory device to a replacement memory device in response to detecting a fault.

78.     During normal operation and upon detecting a dead DataNode (e.g., a DataNode with no heartbeat) the NameNode daemon (management system) bypasses the dead DataNode and sends I/O requests to other DataNodes storing replicas of blocks that were stored on the dead DataNode.  The NameNode then schedules creation of new block replicas (to be stored on replacement memory devices) which result in an updated HDFS NameSpace (new routing algorithm).

79.     Upon detecting a corrupted block (via DataBlockScanner) the NameNode daemon (management system) marks the block replica as corrupt and then schedules a copy of the block to be replicated (stored on replacement memory devices) on another datanode, so its replication factor is back at the expected level. This results in an updated HDFS NameSpace (new routing algorithm).

80.     During normal operation, the DataBlockScanner object creates a list of replicas that serves as the initial list of data blocks that it will scan for errors. When the NameNode becomes aware that a block is corrupt, it updates its internal tables to indicate that a block on a specific DataNode is corrupt and enters the corrupt replica into a list of blocks needing additional replicas.  Once the replica has been created, the identity of the new replicas in this DataNode are sent to the NameNode.

81.     When the NameNode daemon detects a fault (e.g. a dead NameNode or corrupt data block) an updating of the HDFS NameSpace is triggered that results in updates to the NameNode NameSpace (a new routing algorithm provided to the

switch controller).

82.　Sling Media is on notice of the infringing products, services, features, and how Sling Media operates the Accused Instrumentalities to perform the claimed methods and use the claimed apparatuses.

83.　Sling Media's infringing conduct has damaged MNS.

84.　Sling Media is liable to MNS in an amount that adequately compensates it for Sling Media's infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## NOTICE OF REQUIREMENT OF LITIGATION HOLD

85.　Sling Media is hereby notified they are legally obligated to locate, preserve, and maintain all records, notes, drawings, documents, data, communications, materials, electronic recordings, audio/video/photographic recordings, and digital files, including edited and unedited or "raw" source material, and other information and tangible things that Sling knows, or reasonably should know, may be relevant to actual or potential claims, counterclaims, defenses, and/or damages by any party or potential party in this lawsuit, whether created or residing in hard copy form or in the form of electronically stored information (hereafter collectively referred to as "Potential Evidence").

86.　As used above, the phrase "electronically stored information" includes without limitation: computer files (and file fragments), e-mail (both sent and received, whether internally or externally), information concerning e-mail (including but not limited to logs of e-mail history and usage, header information, and deleted but recoverable e-mails), text files (including drafts, revisions, and active or deleted word processing documents), instant messages, audio recordings and files, video footage and files, audio files, photographic footage and files, spreadsheets, databases, calendars, telephone logs, contact manager information,

internet usage files, and all other information created, received, or maintained on any and all electronic and/or digital forms, sources and media, including, without limitation, any and all hard disks, removable media, peripheral computer or electronic storage devices, laptop computers, mobile phones, personal data assistant devices, Blackberry devices, iPhones, video cameras and still cameras, and any and all other locations where electronic data is stored.  These sources may also include any personal electronic, digital, and storage devices of any and all of Defendant's agents, resellers, or employees if Sling's electronically stored information resides there.

87.    Sling Media is hereby further notified and forewarned that any alteration, destruction, negligent loss, or unavailability, by act or omission, of any Potential Evidence may result in damages or a legal presumption by the Court and/or jury that the Potential Evidence is not favorable to Sling's claims and/or defenses.  To avoid such a result, Sling's preservation duties include, but are not limited to, the requirement that Sling immediately notify its agents and employees to halt and/or supervise the auto-delete functions of its electronic systems and refrain from deleting Potential Evidence, either manually or through a policy of periodic deletion.

### PRAYER FOR RELIEF

MNS prays for the following relief:

a) A judgment be entered that Sling Media has directly and indirectly infringed one or more claims of the Asserted Patents;

b) A judgment be entered that the Asserted Patents are valid and enforceable;

c) An award of damages adequate to compensate MNS for Sling Media's infringement up until the date such judgment is entered, including prejudgment and post-judgment interest, costs, and disbursements as

justified under 35 U.S.C. § 284 and an accounting, if necessary to adequately compensate MNS for Sling Media's infringement;

d) A judgment that MNS be awarded attorneys' fees, costs, and expenses incurred in prosecuting this action; and

e) A judgment that MNS be awarded such further relief at law or in equity as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

MNS demands trial by jury for all issues so triable pursuant to Fed. R. Civ. P. 38(b) and Civil L.R. 3-6(a).

Dated:  August 12, 2019

By  /s/Stamatios Stamoulis
Stamatios Stamoulis
Delaware Bar No. 4606
stamoulis@swdelaw.com
Richard C. Weinblatt
Delaware Bar No. 5080
weinblatt@swdelaw.com
**STAMOULIS & WEINBLATT LLC**
800 West Street, Third Floor
Wilmington, DE  19801
Telephone: (302) 999-1540

Cabrach J. Connor
Texas Bar No. 24036390 (*pro hac vice* pending)
cab@connorkudlaclee.com
Kevin S. Kudlac
Texas Bar No. 00790089 (*pro hac vice* pending)
kevin@connorkudlaclee.com
Jennifer Tatum Lee
Texas Bar No. 24046950 (*pro hac vice* pending)
jennifer@connorkudlaclee.com
**CONNOR KUDLAC LEE PLLC**
609 Castle Ridge Road, Suite 450
Austin, TX 78746
Telephone:  512.777.1254
Facsimile:  888.387.1134

*Attorneys for Plaintiff*
Mobile Networking Solutions, LLC